## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ERIC S. CLARK,

     PLAINTIFF,

     v.

THE CITY OF WILLIAMSBURG, KANSAS,

     DEFENDANT.

CASE NO. 2:17-CV-02002-HLT

### MEMORANDUM AND ORDER

Plaintiff Eric Clark brings this action under 42 U.S.C. § 1983 alleging Defendant City of Williamsburg, Kansas ("City") violated his constitutional rights under the First and Fourth Amendments.[1] He also brings an inverse condemnation action under Kansas state law. Doc. 55 at 14. This case stems from a violation notice the City sent Clark regarding signs at the edge of Clark's property. Both parties have filed summary-judgment motions as to all claims. Doc. 78; Doc. 91.

As to Clark's First Amendment claim, the Court finds that Article 8, § 4.A.(6) is an unconstitutional content-based restriction and, therefore, grants Clark summary judgment on that count. That provision is severable from the remainder of the City's sign ordinance, which the Court does not evaluate because Clark lacks standing to make that challenge. The Court grants summary judgment to the City on Clark's Fourth Amendment claim (because there was no search of Clark's

---

[1]   Clark mentions the Fifth and Fourteenth Amendments on the first page of his First Amended Complaint—the operative complaint—but the First Amended Complaint does not include a cause of action under the Fifth or Fourteenth Amendments. Doc. 55 at 1, 14.

property), and on Clark's inverse-condemnation claim (because Clark has not established any taking).

## I.    BACKGROUND

On February 23, 2015, the City's code enforcement officer, Tony De La Torre, sent Clark a "NOTICE OF VIOLATION" of the City's sign ordinance. Doc. 79 at 4; Doc. 92-22 at 2. The violation notice stated that Clark was in violation of the City's sign ordinance because he had "three large barrels, several signs, and other affixed objects" on the City's "right of way." Doc. 92 at 18. According to the violation notice, the items Clark needed to remove were located within the City's eighty-foot easement. *Id.* The violation notice requested Clark's voluntary cooperation, but it also informed him a citation could be issued and the items removed if he did not comply. Doc. 92 at 5-6; Doc. 100 at 4; Doc. 92-22 at 2. The violation notice directed Clark to immediately contact the City by phone if he had any questions or believed he received the notice in error; otherwise, "actions will continue toward resolution." Doc. 92-22 at 2. Clark did not call. Doc. 100 at 27.

On March 16, 2015, De La Torre went to Clark's property to discuss the matter. Doc. 79 at 10-11; Doc. 92 at 12. Clark's house sits back from the road and has a gravel driveway on one side that extends from the road to the back of the house, where it widens into a gravel apron or parking area. Doc. 92 at 14. On the day De La Torre went to Clark's property, there were no "No Trespass" signs posted. *Id.* Clark seldom uses the front door of his house and has trained his family members to go to the back door when they visit. *Id.* at 15. The front door, which has no doorbell, is accessed by a front porch with steps up the front. *Id.* at 15-16. There is no sidewalk or worn path to the front porch, and certain items on the porch partially blocked the entrance, or at least would have required a visitor to squeeze by them to get to the door. *Id.* A tarp was hung up along the

north side of the porch. *Id.* at 15. Vegetation covered at least some of the entrance to the front porch. *Id.* At his deposition, Clark was asked, "Would you agree that it doesn't look like an invitation to the front door with those things sitting in front of it?" Clark answered, "I would hope so, but I can't really say that nobody would be deterred from going up there." *Id.*; Doc. 100 at 18.

On March 16, 2015, De La Torre parked near the road. He walked up the driveway and saw that there was no path to the front door and that the door itself was blocked by items on the porch. He then heard someone in the back and started walking that way on the driveway. Doc. 92 at 16-17; Doc. 100 at 19-20. De La Torre then encountered Clark, who got angry and told De La Torre to leave several times in the span of less than a minute. Doc. 92 at 17. Clark then went back into the house and De La Torre left. Doc. 92 at 16; Doc. 100 at 19. De La Torre believes he only proceeded half-way to three-quarters up the driveway and did not leave the driveway or gravel apron/parking area near the back of the house. Doc. 92 at 17; Doc. 100 at 20-21. De La Torre estimates he was on Clark's property for 3-4 minutes; Clark claims it was 5-6 minutes. Doc. 92 at 16; Doc. 100 at 19.

Though Clark did not call the City or discuss the violation notice with De La Torre when he went to Clark's property, Clark did send the City some letters in response. Doc. 100 at 22; Doc. 92 at 18-19. Clark disputed that he was in violation of any sign ordinance provision and asserted that the sign ordinance was unconstitutional. Doc. 100 at 22; Doc. 92 at 18-19. In one of those letters, which was labeled a litigation notice, Clark stated that he was fearful of putting up any new objects until the enforcement threat was removed. Doc. 79 at 5; Doc. 92 at 18-19.

The City has never affirmatively retracted the violation notice. Doc. 79 at 4; Doc. 92 at 10. But after receiving the litigation notice, the mayor spoke with the City's attorney, who advised the City to not continue investigating Clark's alleged violations of the sign ordinance "further." Doc.

92 at 19; Doc. 100 at 22. The mayor discussed the issue with the city council, and the city council agreed to that course. Doc. 92 at 19; Doc. 100 at 22. De La Torre's notes state that the City decided not to take any action on the violation notice "at this time." Doc. 100 at 22; Doc. 79-2 at 23. Four months later, the City suspended its code enforcement officer position due to budget constraints and has had no code enforcement officer since that time. Doc. 79 at 6; Doc. 92 at 19. Clark was aware that the City suspended the position. Doc. 92 at 17. The City also did not reappoint a judge for the City's municipal court and no judge has held a municipal judicial proceeding in the City since May 2016. Doc. 92 at 19; Doc. 100 at 23. The City has indicated that it will not enforce the sign ordinance against Clark or any one else "during the pendency of this case." Doc. 92 at 19.

## II.     STANDARD

Both parties have filed separate motions for summary judgment. Summary judgment is appropriate if the record establishes that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To carry this burden, the nonmovant "may not rely merely on . . . its own pleadings." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (internal quotations and citations omitted). "Rather, it must come forward with facts supported by competent evidence." *Id*. The inquiry turns on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-

52. In applying this standard, courts must view the evidence and all reasonable inferences from it in the light most favorable to the nonmovant. *Matsushita*, 475 U.S. at 587.

## III.    ANALYSIS

Clark has asserted three claims in this case. Count I and Count II arise under the Constitution and are brought pursuant to 42 U.S.C. § 1983. They allege, respectively, violations of the First and Fourth Amendments. The third count—for inverse condemnation—is brought under Kansas state law. Doc. 55 at 14-15. Each is discussed in turn.[2]

### A.    Clark's First Amendment Allegations (Count I)

A complicating factor in analyzing Clark's First Amendment claim is that the parties disagree on the scope of this case. Clark asserts a broad challenge to several provisions of the City's sign ordinance, rather than focusing on the February 23, 2015 violation notice. Doc. 79 at 44-79. By contrast, the City disputes that Clark has standing to challenge <u>any</u> provisions of the City's sign ordinance. Doc. 92 at 27-32. But to the extent Clark does have standing, the City limits its analysis to whether the City is entitled to prohibit signs on public property.[3] According to the City, the "February 23, 2015 Notice of Violation addressed only Article 8, § 5 of the City sign regulations." Doc. 92 at 33.

The Court agrees with the City that Clark lacks standing to challenge most provisions in the sign ordinance, as discussed below. But the Court disagrees with the City about what provision

---

[2]    On the last page of Clark's motion, he states, "The need for a permanent injunction can be found in that the City's policy (zoning regulations) was the moving force (causation) of a chilling effect on Clark's First Amendment right of free speech  through credible threat of enforcement and a credible threat of enforcement remains." Doc. 79 at 79. To the extent Clark intends that brief statement to be a request to the Court for an injunction, it is wholly without support and is denied. Based on the ruling in this order, it is also largely moot.

[3]    The City frequently refers to both a prohibition of signs on City right-of-ways and on public property in general. But it does not appear that the City is drawing a distinction between the two, as right-of-ways are just a subset of public property; nor does the City's sign ordinance make that distinction.

is at issue. The violation notice does not cite any specific provision in the sign ordinance by number, let alone Article 8, § 5. But it did allege that, "[u]nder the City of Williamsburg's Ordinance, political signs shall not be placed on or otherwise affixed to any public building or sign, right of way, sidewalks, utility pole, street lamp post, tree, or other vegetative matter, Public Park, or other public property." Doc. 99-22 at 2. That recites nearly verbatim Article 8, § 4.A.(6). Article 8, § 5 is not quoted, paraphrased, or mentioned. Accordingly, to the extent a specific provision is at issue, it is Article 8, § 4.A.(6)—not Article 8, § 5.[4]

Clark's reply clarifies that his standing for a First Amendment challenge is based both on the threatened enforcement action, "as well as the ordinance's prohibitions which stand as prior restraints." Doc. 100 at 37-38. Accordingly, the Court must evaluate Clark's standing to challenge the enforcement action (involving Article 8, § 4.A.(6)), and his broader challenge to other provisions in the sign ordinance. Those are two different claims, and each must be analyzed for standing separately.

---

[4]  Not only does the Court disagree that Clark was cited for violating Article 8, § 5, but the Court also disagrees with the City's contention that the sign ordinance flatly prohibits signs on public property. Article 8, § 5 is titled "Prohibited Signs." Doc. 38-1 at 64. Subsection A of that provision reads, in part: "Signs on Public Property: Any sign installed or placed on public property, except in conformance with the requirements, shall be forfeited to the public and subject to confiscation." *Id*. Article 8, § 5.A. does not say that all signs are prohibited on public property. It says that signs "placed on public property, except in conformance with the requirements, shall be forfeited and subject to confiscation . . . ." *Id.* (emphasis added). An obvious reading of Article 8, § 5 is that signs on public property are simply subject to the general regulations of Article 8 (which includes rules about sign types, zoning district requirements, and size, number, and setback restrictions), and where they are not "in conformance with the requirements," they are subject to confiscation. Clark points this out. The City's only response is that Clark misreads the sign ordinance and that "Article 8, § 5 precludes any sign on public right of way." Doc. 92 at 33. Putting aside this unfortunate failure to elaborate, the City's interpretation is unconvincing. Nothing in Article 8, § 5 flatly suggests that all signs on public property are prohibited, even though other provisions of that section specifically do prohibit certain signs under other circumstances. Doc. 38-1 at 64-65 (stating that "[n]o person shall display upon any sign or other advertising structure any obscene, indecent or immoral matter" and that "Flashing signs . . . shall not be permitted"). If the regulation was meant to prohibit signs on public property, it likely would have just said so. But it does not. Nor does it make sense that Article 8, § 4.A.(6) would carve out a special rule prohibiting political signs on public property (under a heading of "Exemptions" no less), *Id.* at 63-64, if Article 8, § 5.A. simply banned all signs on public property.

1. **Clark suffered an injury-in-fact through issuance of the of the violation notice and may challenge the constitutionality of Article 8, § 4.A.(6).**

Under Article III of the Constitution, there must be a case or controversy before federal courts have jurisdiction. *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003). "To meet this standing requirement, a plaintiff must demonstrate 'that (1) he or she has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision.'" *Id.* (quoting *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997)); *see also Nat'l Council for Improved Health v. Shalala*, 122 F.3d 878, 881 (10th Cir. 1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

To show an injury-in-fact, a plaintiff must demonstrate "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (quoting *Lujan*, 504 U.S. at 560). "Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is 'certainly impending.'" *Lujan*, 504 U.S. at 564 n.2 (internal quotations omitted).[5]

On February 23, 2015, the City sent a "NOTICE OF VIOLATION" to Clark, which stated that the City's code enforcement officer had observed "three large barrels, several signs, and other affixed objects located on the City's right of way" in front of Clark's house. It recited nearly verbatim the language of Article 8, § 4.A.(6) and asked for Clark's "cooperation in correcting all the violations." The violation notice indicated a re-inspection would occur at a later date, and "[i]f

---

[5] The City does not challenge the other two elements of standing, nor do the parties even address them. The Court finds that if Clark suffered an injury-in-fact, the other standing elements would be met.

the violations are not corrected a citation may be issued and objects removed from the City easement." Doc. 92-22 at 2. Clark never removed the items, and instead sent some letters to the City threatening legal action. As a result, the City opted to not pursue the matter further, or at least "at this time." The City has never affirmatively retracted the violation notice. Doc. 79 at 4; Doc. 92 at 10. In its summary-judgment motion, the City has stated that it has no plans to enforce its sign ordinance against Clark or any other citizens "during the pendency of this case." Doc. 92 at 19.

Under these standards, the Court concludes that Clark has suffered an injury-in-fact concrete enough to confer standing to challenge Article 8, § 4.A.(6). Clark was sent a letter titled "NOTICE OF VIOLATION." The City is correct that the letter did ask for Clark's voluntary compliance. But compliance was voluntary only to the extent that, if Clark did not comply, "a citation may be issued and objects removed from the City easement." Doc. 92-22 at 2. Although the City has stopped pursuing the matter at least for the time being (after Clark threatened litigation), Doc. 92 at 18-19, that decision is not permanent, nor has the City rescinded the violation notice. Doc. 79 at 4-5; Doc. 92 at 10; Doc. 100 at 22; Doc. 79-2 at 23 (stating that the matter would not be pursued "at this time").

The Court concludes that Clark has asserted sufficient grounds to confer standing. He was effectively cited for violating Article 8, § 4.A.(6), and his only option was to acquiesce or face further action. To the extent the City does not intend to ever follow up on the violation notice or pursue the matter, it has been somewhat vague as to the duration of that resolve, leaving Clark in limbo regarding his posting of signs—and in particular, political signs—on his property. *See* Doc. 79 at 4-5; Doc. 92 at 10, 19; Doc. 100 at 22; Doc. 79-2 at 23.[6] The Tenth Circuit has stated that,

---

[6]    Both parties include facts about the current staffing—or lack thereof—of the City's zoning enforcement and municipal court staff. At some point after Clark responded to the violation notice, the City suspended its code

though an injury must be impending, a plaintiff "need not 'await the consummation of threatened injury.'" *Essence, Inc. v. City of Federal Heights*, 285 F.3d 1272, 1282 (10th Cir. 2002) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Here, Clark has been threatened with enforcement under the sign ordinance. A "chilling effect on the exercise of a plaintiff's First Amendment rights may amount to a judicially cognizable injury in fact, as long as it 'arise[s] from an objectively justified fear of real consequences.'" *Initiative & Referendum Inst.*, 450 F.3d at 1088 (quoting *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004)). The "mere threat of prosecution under the allegedly unlawful statute" can establish that chilling effect. *See Phelps*, 122 F.3d at 1326. Clark does assert a chilling effect as to Article 8, § 4.A.(6), Doc. 79 at 3, and given the violation notice, that chilling is at the very least "objectively justified." Accordingly, Clark has standing to challenge the provision at issue in the violation notice—Article 8, § 4.A.(6).

## 2. Clark lacks standing to challenge other provisions.

Although Clark has standing to challenge the provision of the sign ordinance whose language was recited nearly verbatim in the violation notice (Article 8, § 4.A.(6)), that does not mean Clark has standing to challenge the entirety of the City's sign ordinance, as he attempts to do. As explained above, the City sent Clark a violation notice that recited the language in Article 8, § 4.A.(6). Doc. 92-22 at 2. The City never sent any notice regarding other provisions. Accordingly, Clark only has standing to challenge Article 8, § 4.A.(6). *See Quinly v. City of Prairie Village*, 446 F. Supp. 2d 1233, 1235 n.1 (D. Kan. 2006) (concluding that the plaintiff lacked

---

enforcement program and did not reappoint its municipal court judge. Doc. 92 at 18-19. The Court concludes these facts do not demonstrate that Clark is fully out from under the threat of enforcement given the City's other statements hedging that it does not plan to pursue this matter "at this time" or "for the duration of this case." The lack of City staff is similarly temporary in nature.

standing to challenge other provisions of sign ordinance where plaintiff did not demonstrate any injury resulting from those other provisions); *see also Essence*, 285 F.3d at 1281-82.

Perhaps recognizing this shortcoming in his case, Clark categorizes his other challenges as "prior restraint" claims and suggests that he is raising an overbreadth challenge to essentially all of the provisions in Article 8. Doc. 79 at 52-53; Doc. 100 at 38-39.[7] But being "prospectively inhibited" is just a "hypothetical injury and not a concrete injury." *Essence*, 285 F.3d at 1281. Similarly, merely couching the challenge of those other provisions in terms of an overbreadth challenge does not in of itself confer standing. *Nat'l Council*, 122 F.3d at 882 ("Although the overbreadth doctrine permits a party to challenge a statute or regulation that has not been unconstitutionally applied to that party, it does not dispense with the requirement that the party itself suffer a justiciable injury."). An overbreadth challenger must still "show its own concrete injury resulting from the challenged statute or regulation." *Id.* at 881. Requiring a plaintiff to assert his own legal rights in an overbreadth challenge "prevents a court from 'premature interpretations of statutes in areas where their constitutional application might be cloudy, and it assures the court that the issues before it will be concrete and sharply presented.'" *Id.* at 883 n.7 (quoting *Sec'y of State v. Munson*, 467 U.S. 947, 955 (1984)).

Clark also alleges an injury-in-fact as to the other provisions based on a chilling of his First Amendment expression. Doc. 79 at 53 (stating that "the City's regulations prohibit, through a chilling effect, the ability of Clark to express himself freely on certain topics at certain times, in certain manners, and in certain places"). As noted above, First Amendment standing may be demonstrated by a showing that a statute has had a chilling effect on a person's speech. *See Ward*,

---

[7]  Clark also suggests he has standing under a "class-of-one" theory. But that is an equal-protection claim, *Jicarilla Apache Nation v. Rio Arriba Cty.*, 440 F.3d 1202, 1209 (10th Cir. 2006), and it is analyzed separately below.

321 F.3d at 1267. But the only chilling Clark has alleged is in regard to prohibitions and regulations of political signs found in Article 8, § 4.A.(6). *See* Doc. 79 at 3 (¶ 10 and ¶ 12, both challenging Article 8, § 4.A.(6)).[8] Accordingly, Clark has not alleged any chilling that could serve as an injury-in-fact to grant him standing to challenge other provisions.

Even if he did allege a chilling as to those other regulations, subjective chilling is not enough. *Ward*, 321 F.3d at 1267. Rather, the "chilling effect on the exercise of a plaintiff's First Amendment rights may amount to a judicially cognizable injury in fact, as long as it 'arise[s] from an objectively justified fear of real consequences.'" *Initiative & Referendum Inst.*, 450 F.3d at 1088 (quoting *D.L.S.*, 374 F.3d at 975). Although Clark can meet that standard as to Article 8, § 4.A.(6) because of the violation notice, all Clark has to challenge the other provisions of the sign ordinance is a conclusory claim that he has been chilled. This is insufficient to raise a judicially cognizable injury-in-fact. *See Nat'l Council*, 122 F.3d at 884 n.9 ("An allegation of inhibition of speech, without more, will not support standing.").

Accordingly, although Clark has standing to challenge Article 8, § 4.A.(6), he lacks standing to challenge other provisions in the sign ordinance. The Court will therefore only evaluate the constitutionality of that provision.

### 3.    Article 8, § 4.A.(6) is a content-based regulation that does not pass strict scrutiny.

As explained above, Article 8, § 4.A.(6) is the provision referenced in the violation notice. That provision states:

> Political signs, not exceeding a total of 20 square feet in area on a lot of record zoned for non-residential purposes, or which is vacant and unplatted, regardless of the zoning district classification; and not exceeding a total of ten (10) square feet on a lot of record in a residential zone district. Political signs shall be displayed for

---

[8]    Statement of Fact 10 also references Article 8, § 9.B. But the conduct Clark alleges has been "chilled" is prohibited by Article 8, § 4.A.(6).

no more than a four-week period preceding and a one-week period following an election. Political signs shall not be placed on or otherwise affixed to any public building or sign, right-of-way, sidewalk, utility pole, street lamp post, tree or other vegetative matter, or any public park or other public property.

Doc. 38-1 at 63-64. Under this provision, "political signs"—which is a term not specifically defined—are treated differently than other signs. They are subject to different size restrictions, have unique time restrictions, and—as discussed above in note 4—are prohibited from being placed on public property, unlike other signs. The question is whether these special rules for political signs pass constitutional muster.

In evaluating restrictions on speech, like Article 8, § 4.A.(6), the first question is whether the provision is content-neutral or content-based. *Quinly*, 446 F. Supp. 2d at 1238 (citing *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005)). "In the context of evaluating the constitutionality of a sign ordinance, the ordinance will be deemed content based if a violation of the ordinance may be determined only by examining the content of the sign." *Id*. Content-neutral signs are subject to only intermediate scrutiny, while content-based signs are subject to strict scrutiny. *Id.* Content-based laws "are presumptively unconstitutional." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015).

Based on these standards, the Court finds as a matter of law that Article 8, § 4.A.(6) is a content-based regulation. *See id.* at 2227 ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."); *see also Menotti v. City of Seattle*, 409 F.3d 1113, 1128-29 (9th Cir. 2005) (evaluating content neutrality as a question of law); *Pahls v. Thomas*, 718 F.3d 1210, 1234 (10th Cir. 2013) (citing *Menotti*). On its face, Article 8, § 4.A.(6) applies only to "political signs," meaning that the content

of a particular sign must be evaluated to determine whether the provision applies.[9] *Reed*, 135 S. Ct. at 2227 (finding that a sign code that set different restrictions for "political," "temporary directional," and "ideological" signs "is content based on its face"). For example, if a sign was posted that was nine square feet in area, one would have to read the sign to know whether it was a permissible political sign (under Article 8, § 4.A.(6)), or an oversized and therefore impermissible garage sale sign (which are limited to five square feet under Article 8, § 4.A.(7)). Likewise, if a sign was still posted more than a week after an election, it might be okay if it directs customers to parking in the back of a store, which would be allowed at any time under Article 8, § 4.A.(4), but it would be impermissible if it advocated for a certain candidate or political issue, as Article 8, § 4.A.(6) imposes a temporal limit on political signs.[10] And if a sign was posted on a City right-of-way, it would only be prohibited outright if it had a political message, as the sign ordinance only bans the placement of <u>political</u> signs on public property and City right-of-ways. *See supra* note 4.

These distinctions are based solely on the content of the sign at issue. Where the restrictions that apply depend on the "communicative content" of the sign, like here, the provision is content-based. *Reed*, 135 S. Ct. at 2227; *see also Outdoor Sys., Inc. v. City of Lenexa*, 67 F. Supp. 2d 1231, 1240 (D. Kan. 1999) (noting that a durational restriction on political signs is content based and

---

[9]  The City suggests that Article 8, § 4.A.(6) says "political signs," but it actually means "election signs." Doc. 92 at 6-7. Although the provision does discuss posting political signs in relation to an election, the actual text clearly says it applies to "political signs." Even if it did only intend to apply to "election signs," the Court is not convinced this would make it any less content-based.

[10]  State law prohibits a city or county from regulating "the placement of or the number of political signs on private property or the unpaved right-of-way for city streets or county roads on private property during the 45-day period prior to any election and the two-day period following any such election." K.S.A. § 25-2711. The City concedes that its sign ordinance would preclude it from "prohibiting the placement or number of political signs on the unpaved right-of-way for City streets for 45 days prior to and two days following an election." Doc. 92 at 6. Article 8, § 4.A.(6) would presumably be in effect all other times. But other than for this 48-day period in election years, that does not obviate the need to evaluate its constitutionality for the remainder of the time it is in effect.

citing cases holding the same). And when a sign ordinance is content-based, strict scrutiny applies. *Quinly*, 446 F. Supp. 2d at 1238.

As explained above, the City does not analyze whether Article 8, § 4.A.(6) as a content-based regulation because of its position that the regulation at issue is Article 8, § 5, which it asserts neutrally bans all signs on public property. But as discussed above, the Court disagrees that that provision is at issue, or that it bans all signs on City property. *See supra* note 4. This is why the Court concludes that the City's reliance on *Members of City Council of City of Los Angeles v. Taxpayers for Vincent* is misplaced.

In *Vincent*, the Supreme Court upheld a ban of temporary signs on public property. *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984). But that ordinance was not content-based—it barred all signs on public property. *Id.* at 817; *see also Reed*, 135 S. Ct. at 2232 (describing ban in *Vincent* as "content-neutral").[11] By contrast, Article 8, § 4.A.(6) does not neutrally ban all signs on public property—only political signs. That prohibition of "public discussion of an entire topic" is why Article 8, § 4.A.(6) faces stricter scrutiny under the First Amendment. *Reed*, 135 S. Ct. at 2230 ("But it is well established that '[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.'" (quoting *Consolidated Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 537 (1980))).

---

[11] For similar reasons, the other cases cited by the City are distinguishable. *See Johnson v. City and Cty. of Philadelphia*, 665 F.3d 486, 488 (3d Cir. 2011) (discussing ordinance that prohibits the posting of signs on public right-of-ways); *Davidson v. City of Culver City*, 2004 WL 5361378, at *3 (C.D. Cal. July 28, 2004) (discussing ordinance that barred all private signs on city right-of-ways); *Sokolove v. City of Rehoboth Beach*, 2005 WL 1800007, at *4 (D. Del. July 28, 2005) (discussing an ordinance that permits governmental signs on city right-of-ways but not private signs); *Constr. & Gen. Laborer's Local Union No. 330 v. Town of Grand Chute*, 2014 WL 1689720, at *1 (E.D. Wis. Apr. 29, 2014) (discussing ordinance that forbids all signs on public right-of-ways except traffic signs and rejecting argument that traffic-sign distinction is content-based).

This is not to say that the City could not, in a content-neutral fashion, actually ban all signs on public property, assuming it could meet the requisite intermediate level of scrutiny. *Id*. 2232 ("And on public property, the Town may go a long way toward entirely forbidding the posting of signs, so long as it does so in an evenhanded, content-neutral manner."). But it cannot, as it does here, just prohibit one type of sign based on content—political signs—without coming under strict scrutiny. *Quinly*, 446 F. Supp. 2d at 1238.

The City also argues that the different categories of signs listed in the "Exemptions" section (which includes Article 8, § 4.A.(6)) "are reasonably limited and do not address viewpoint or expressive content." Doc. 92 at 33.[12] This argument is not persuasive. First, it strains credulity that a political sign somehow does not touch on "expressive content" protected by the First Amendment. Second, reasonableness is not the standard. *Reed*, 135 S. Ct. at 2228 ("[A]n innocuous justification cannot transform a facially content-based law into one that is content neutral."). Third, that Article 8, § 4.A.(6) operates equally without regard to any particular viewpoint does not speak to whether it is content neutral. *See Quinly*, 446 F. Supp. 2d at 1238 n.5 (noting that sign ordinance that does not distinguish based on promotion of any particular political party or candidate may be "viewpoint" neutral, but the wholesale prohibition of the topic altogether makes it content-based). The Supreme Court has clarified that regulations that are not based on any disagreement with the message conveyed will still be subject to strict scrutiny where the

---

[12] The "Exemptions" section, Article 8, § 4, states that "[t]he following signs shall be exempt from the requirements of this article, except for the provisions of Sections 3(A) through 3(H) above." Doc. 38-1 at 63. Section 3 includes certain definitions and prohibits signs that flash, signs that block accessways or windows, signs placed on trees or utility poles, and signs that interfere with traffic safety. *Id*. at 62-63. Besides political signs, Article 8, § 4 includes exemptions for "[f]lags or emblems of a government or of a political, civic, philanthropic, educational or religious organization, displayed on private property," governmental signs, "memorial signs and tables" on public or private property, small signs on private property for the convenience of the public (entrance/exit, parking, restroom signs, etc.), scoreboards in athletic stadiums, and temporary garage sale signs "for a period not to exceed five (5) days." *Id*. at 63-64. The placement of garage sale signs on public right-of-ways is neither explicitly permitted or prohibited.

regulation is content-based on its face. *Reed*, 135 S. Ct. at 2228 ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 429 (1993))).

Accordingly, strict scrutiny applies to Article 8, § 4.A.(6) because it is content-based. Strict scrutiny measures whether the ordinance serves a compelling governmental interest and is narrowly tailored to serve that end. *Reed*; 135 S. Ct. at 2231; *Quinly*, 446 F. Supp. 2d at 1238; *see also Outdoor Sys.*, 67 F. Supp. 2d at 1240. "Whether something qualifies as a compelling interest is a question of law." *United States v. Hardman*, 297 F.3d 1116, 1127 (10th Cir. 2002). The burden is on the City to show a compelling interest underlies Article 8, § 4.A.(6). *Reed*, 135 S. Ct. at 2231.

But this analysis again is complicated because the City focuses on a provision that was not referenced in the violation notice, and that frankly does not say what the City says it says. *See supra* note 4. Here, the City states that the "restriction on signing on City property, including rights-of-way, serves a significant governmental interest" in improving "aesthetics and traffic safety." Doc. 92 at 35. The City notes that such interests are generally accepted for purposes of showing a significant governmental interest. But because Article 8, § 4.A.(6) is content-based, strict scrutiny requires a <u>compelling</u> governmental interest. *Quinly*, 446 F. Supp. 2d at 1238. And many courts have concluded that aesthetics and traffic safety <u>are not</u> compelling reasons to impose content-based restrictions on signs. *See id.* at 1243-44 (noting that traffic safety and aesthetic interests are not compelling); *Outdoor Sys., Inc. v. City of Merriam*, 67 F. Supp. 2d 1258, 1269 (D. Kan. 1999); *see also Solantic*, 410 F.3d at 1268 (citing *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507-08 (1981)). The lack of a compelling governmental interest means Article 8, § 4.A.(6) fails strict scrutiny.

Although the City states in its motion that the reason for the restriction is aesthetics and traffic safety, Article 8, § 4.A.(6) singles out political signs for a different reason:

> The City recognizes that the expression of political speech is an important and constitutionally protected right; that political signs have certain characteristics that distinguish them from many of the other types of signs permitted and regulated by the City, including the fact that these signs generally do not meet the regular structural design of permanent signs, given their temporary nature; that political signs therefore present a potential hazard to persons and property; and that the City must impose reasonable time limits on the display of political signs for these reasons.

Doc. 38-1 at 64. This language suggests that the reason for the special treatment of political signs is the "potential hazard to persons and property" due to the temporary nature of most political signs. Assuming this is the interest served, the question is whether it is compelling and whether Article 8, § 4.A.(6) is narrowly tailored to serve that interest.

Limiting "potential hazard to persons and property" is very broad. Given that "traffic safety" is generally not viewed as a compelling governmental interest, *see Quinly*, 446 F. Supp. 2d at 1240, the City's generalized concern about limiting "potential hazard[s]" is likely as equally uncompelling. Although preventing or abating specific hazards <u>may</u> in some instances present a compelling governmental interest, no such justification is apparent or asserted by the City in this case.

Even assuming limiting "potential hazard[s]" was a compelling governmental interest, an additional problem here is that the City has attempted to serve that interest in a way that targets an entire topic of discussion while leaving others untouched entirely, and while only marginally addressing the stated governmental interest. As the Supreme Court noted in *Reed*, the ordinance's "distinctions fail as hopelessly underinclusive." *Reed*, 135 S. Ct. at 2231.

Article 8, § 4.A.(6) singles out only one type of temporary sign as potentially hazardous— those with political content. But other temporary signs, like garage sale signs or real estate signs,

are not subject to the same size or durational limitations. *See Quinly*, 446 F. Supp. 2d at 1240

("[W]hile the City's asserted interest in traffic safety is legitimate, the ordinance, as currently

written, does not address that interest because the size limitations applicable to informational signs

are not applicable to other signs which present identical concerns."). Likewise, only political signs

are flatly prohibited on public property, while other temporary signs could presumably be placed

on public property if they meet the other requirements of Article 8.[13] But it is unclear why signs

with political messages would be more hazardous on public property than other temporary signs

in that same area. *See Reed*, 135 S. Ct. at 2231-32; *see also Dimmitt v. City of Clearwater*, 985

F.2d 1565, 1570 (11th Cir. 1993) (finding that aesthetics and traffic safety interests are not served

by restricting speech based on the content of the message expressed). This "underinclusiveness"

is what fails strict scrutiny: "a 'law cannot be regarded as protecting an interest of the highest

order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to

that supposedly vital interest unprohibited.'" *Reed.* 135 S. Ct. at 2232 (quoting *Republican Party

of Minn. v. White*, 536 U.S. 765, 780 (2002)).[14]

Accordingly, as a matter of law, the City's content-based provision regarding political

signs does not pass strict scrutiny and is therefore unconstitutional. *See United States v. Friday*,

525 F.3d 938, 949 (10th Cir. 2008) ("In First Amendment cases, application of the least-restrictive-

means (or 'narrow tailoring') test to a given set of facts is well understood to be a question of

---

[13] As discussed above, the Court reads Article 8 as only prohibiting <u>political</u> signs from being placed on any City property, which is one reason Article 8, § 4.A.(6) is an impermissible content-based limitation. The Court does not reach the question of what signs the City could or could not prohibit on its own property, or under what terms, as long as it did so in a content-neutral manner. *See Reed*, 135 S. Ct. at 2232.

[14] The Court also notes that Article 8 contains a separate provision that allows the City to remove any sign that "is unsafe or insecure, or is a menace to the public." Doc. 38-1 at 70 (Article 8, § 10). That content-neutral provision would seemingly suffice to address the City's concerns about potentially hazardous temporary signs without needing to single out political signs for special rules. *See Quinly*, 446 F. Supp. 2d at 1245 ("To the extent the City is concerned about deteriorating signs creating an aesthetic eyesore, the City could enact other provisions mandating the removal of any sign in a state of disrepair.").

law."). The Court bases this ruling solely on the fact that the City's sign ordinance singles out political signs for different rules in a manner that does not narrowly tailor the restriction to serve a compelling governmental interest. The Court does not decide whether the restrictions applied to political signs would be constitutional if applied to all signs in a content-neutral manner, *see, e.g.*, *Reed*, 135 S. Ct. at 2232, as it need not make that decision to resolve the current dispute between the parties.

### 4. Article 8, § 4.A.(6) can be severed from the remainder of the City's sign ordinance.

Having determined that Article 8, § 4.A.(6) is unconstitutional, the next question is whether it can be severed from the rest of the City's sign ordinance. Severability is determined using state law. In Kansas, the question is whether "the act would have been passed without the objectional portion and if the statute would operate effectively to carry out the intention of the legislature with such portion stricken . . . ." *Outdoor Sys.*, 67 F. Supp. 2d at 1241 (quoting *Thompson v. K.F.B. Ins. Co.*, 850 P.2d 773, 782 (Kan. 1993)). Severability will be assumed "if the unconstitutional part can be severed without doing violence to legislative intent." *Quinly*, 446 F. Supp. 2d at 1246 (quoting *Thompson*, 850 P.2d at 782). Where a portion of a statute is severable, the Court "should and need not decide whether the rest of the statute is unconstitutional." *Williams Natural Gas Co. v. Supra Energy, Inc.*, 931 P.2d 7, 13 (Kan. 1997). "[W]here unconstitutional parts of a statute can be readily separated from the remainder of the statute without affecting the meaning of what remains, the unconstitutional language will be stricken and the constitutional portion will stand." *Id.* (quoting *State v. Rupert*, 802 P.2d 511, 514 (Kan. 1990)).

The City argues that "if any of the exemptions were considered to be content-based, such an exemption should be severed from the regulations to uphold the remainder," noting that the City's zoning ordinance (of which the sign ordinance is a part) contains a severability clause in

Article 3, § 2. Doc. 92 at 34. Although the Kansas Supreme Court has stated that the existence of a severability clause is not significant, *Thompson*, 850 P.2d at 782, the Court concludes that other concerns weigh in favor of severing Article 8, § 4.A.(6). Specifically, Article 8, § 4.A.(6) is a self-contained exemption to the sign ordinance. It can be easily separated without affecting the meaning of the other provisions. *Quinly*, 446 F. Supp. 2d at 1247 ("[E]ven without these four provisions, the ordinance remains a comprehensive and coherent system of sign regulation."); *Outdoor Sys.*, 67 F. Supp. 2d. at 1242 ("The restriction on political campaign signs is not intertwined with the remaining provisions of the ordinance . . . .").

Although Article 8, § 4.A.(6) is listed as an "Exemption" to the sign ordinance, it actually sets <u>more</u> restrictive rules for political signs. Removing it would simply put political signs back on par with other signs. *See Quinly*, 446 F. Supp. 2d at 1247. ("[T]here is no basis to believe that the City council would have preferred having no sign ordinance at all to one that contains all the current provisions other than the four isolated provisions discussed above."). Based on that, the Court cannot conclude that the City would not have passed the sign ordinance but for the inclusion of Article 8, § 4.A.(6).

Accordingly, Article 8, § 4.A.(6) is severed from the City's sign ordinance.

### 5. Clark's "class of one" claim fails.

Clark purports to bring a "class of one" Equal Protection claim.[15] Doc. 79 at 65-66. Although Clark raises this claim in his motion, he does little to explain it, other than suggesting that his property "appears to be the first and only property against which the City has ever enforced it's [sic] sign regulations which were enacted around 2003 even though numerous residences have

---

[15] As noted above, the parties analyze Clark's class-of-one claim under his First Amendment claim, though it is generally described in terms of Equal Protection. *See Jicarilla Apache Nation*, 440 F.3d at 1209.

had signs in the right of way of their road frontage." Doc. 79 at 65 (citing to statement of facts ¶¶ 14-17). But the facts he states to support that contention fail to support it or are controverted. *See* Doc. 79 at 4; Doc. 92 at 9-10. Only one of the cited facts even alleges that Clark was singled out for disparate treatment, and the City controverts that there were other residents with signs comparable to Clark's. Doc. 79 at 4; Doc. 92 at 9-10.

The Tenth Circuit has taken a cautious approach in "class of one" cases, wary of "turning even quotidian exercises of government discretion into constitutional causes." *Jicarilla Apache Nation*, 440 F.3d at 1209. In *Jicarilla Apache Nation,* the Tenth Circuit explained that the "paradigmatic class of one case" involves "a public official inflict[ing] a cost or burden on one person without imposing it on those who are similarly situated in material respects, and does so without any conceivable basis other than a wholly illegitimate motive." *Id*. Although it is not settled that a plaintiff must demonstrate a "subjective ill will" on the part of the government official, *id.* at 1209-10, the existence of an objectively reasonable basis for the disputed action will generally defeat a claim that the decision of the government official was "irrational and wholly arbitrary." *Id.* at 1210-11. "This standard is objective—if there is a reasonable justification for the challenged action, we do not inquire into the government actor's actual motivations." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011).

Clark's claim fails on this point. There is no dispute that there was an objectively reasonable justification for the action—Clark had signs on his property that were at least presumably not in conformance with the City's sign ordinance. Even though Clark disputes whether the City has a valid right-of-way at the edge of his property, he has set forth no facts showing that De La Torre acted irrationally or in a wholly arbitrary manner.

Further, to prevail on this theory, Clark must point to others who are similarly situated in "every material aspect." *Jicarilla Apache Nation*, 440 F.3d at 1210; *Kansas Penn Gaming*, 656 F.3d at 1216 ("To prevail on this theory, a plaintiff must first establish that others, 'similarly situated in every material respect' were treated differently."). This is an "exacting burden[]" because "it is exceedingly difficult to demonstrate that any difference in treatment is not attributable to a quirk of the plaintiff or even to the fallibility of administrators whose inconsistency is as random as it is inevitable" *Jicarilla Apache Nation*, 440 F.3d at 1213.

Here, Clark has not met that burden. All Clark has stated is his case "appears" to be the first case of enforcement "even though numerous residences have had signs in the right of way of their road frontage." Doc. 79 at 65. But the only evidence cited for that assertion is Clark's own affidavit stating he has observed residences with political signs and mailboxes in the right-of-way, as well as an auto repair sign in the right-of-way "in place for about a year or maybe longer a few years ago but I cannot recall the exact timeframe." Doc. 79-2 at 3. This falls far short of showing similarity "in every material respect." Indeed, in response to the City's assertion that the signs on Clark's property were unique in quantity and placement, Doc. 92 at 17, Clark responded by stating that no facts cited or offered by the City can prove that. Doc. 100 at 21. But notably, it is Clark's burden to prove others were similarly situated in every material respect, not the City's burden to disprove. *See Jicarilla*, 440 F.3d at 1212. Accordingly, even if Clark could meet the first prong of the class-of-one test and show irrational and arbitrary action on the part of a City official, Clark has not met his burden under the summary-judgment standard to point to sufficient evidence that a jury could rely on to find that he was treated differently than others who are similarly situated in every material respect. *See Matsushita Elec. Indus.*, 475 U.S. at 586-87; *see also Liberty Lobby*,

477 U.S. at 251-52. Accordingly, the City is entitled to summary judgment on Clark's class-of-one theory.

**B.    Clark's Fourth Amendment Allegations (Count II)**

In his Fourth Amendment claim, Clark alleges that De La Torre performed an unlawful search of his property on March 16, 2015. Clark attributes this to the City's zoning ordinance or else the City's failure to train its code enforcement officers, either of which he contends make the City liable for De La Torre's actions. Clark also challenges portions of the City's zoning ordinance, which he says permitted the search, as facially unconstitutional under the Fourth Amendment. Doc. 84 at 14-15.

**1.    Clark has not established that an unlawful search occurred.**

Although Clark asserts that the search of his property was the result of either the City's zoning regulations or a failure to train, that question is only important if there was a Fourth Amendment violation to begin with. This is because the City can only be liable for De La Torre's actions if De La Torre's actions were unconstitutional. *See Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir. 1996) ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers." (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir.1993))).

Clark argues that De La Torre entered his property seeking information about whether Clark would remove the signs at issue and did so in a manner that "exceeded the implied license of *Florida v. Jardines.*" Doc. 79 at 34-35. Specifically, Clark takes issue with the fact that De La Torre did not knock on his front door but instead walked down the driveway after hearing noises toward the back. This, Clark contends, was an unlawful search of the curtilage of his house. Doc. 79 at 38. Defendants counter that De La Torre never entered the curtilage of Clark's property, and

even if he did, he did so in taking the most common path available to visitors in an attempt to contact Clark. Doc. 92 at 41-45.

A "search" happens under the Fourth Amendment when a person's reasonable expectation of privacy "is infringed." *Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 63 (1992). Courts acknowledge that an individual has a reasonable expectation of privacy in the curtilage of his home. *Lundstrom v. Romero*, 616 F.3d 1108, 1128 (10th Cir. 2010). The curtilage of the home—the area "immediately surrounding and associated with the home"—is "as 'part of the home itself for Fourth Amendment purposes.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)).

Even given these protected areas, the Supreme Court has explained that an implicit license exists that allows visitors to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8. The same license is extended to law enforcement officers, who may approach a home to talk to the owner without a warrant and without disrupting any Fourth Amendment protections. *Id.*; *see also United States v. Shuck*, 713 F.3d 563, 567 (2013) ("[A] 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion." (quoting *United States v. Cruz-Mendez*, 467 F.3d 1260, 1264 (10th Cir. 2006))).

Clark argues that *Jardines* drew an explicit line about what is allowed for a knock-and-talk, namely, that the officer may only "approach the home by the font path, knock promptly, wait briefly to be received, and then (absent an invitation to linger longer) leave." Doc. 79 at 38 (quoting *Jardines*, 569 U.S. at 8). But Clark misconstrues the holding of *Jardines*. It did not hold that was the only permissible way to approach a house. In *Jardines*, the issue was whether the typical license to approach a house extended to bringing a drug-sniffing dog onto the front porch to do an

investigation. *Jardines*, 569 U.S. at 9. The Supreme Court concluded it did not extend that far because, while it may be routine to have someone knock on the front door, "that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police." *Id*. The scope of any license, therefore, is limited in both area and purpose. *Id*.

But other courts have held that the license to approach a house extends to the normal path taken by visitors. In *United States v. Shuck*, the defendant argued that a knock-and-talk at his trailer home was unconstitutional because officers conducted it at the back door of the home without knocking on the front door first. *Shuck*, 713 F.3d at 567.[16] The Tenth Circuit rejected that argument, even assuming the officers went into the home's curtilage, because the "'portion of the curtilage' that is 'the normal route of access for anyone visiting the premises' is only a 'semi-private area' on which police may set foot if they 'restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches).'" *Id*. (quoting 1 Wayne R. LaFave et al., Search & Seizure § 2.3(f) (5th ed., 2012 update)). When officers in *Shuck* first approached the house, there was a fence enclosing the front yard and part of the driveway. The gate was locked and appeared that it had not been used in some time. The officers then went around the fence to the back door because it "appeared persons entering the trailer entered through the back door." *Id*. at 565. Because "the evidence showed that by approaching the back door as they did, the officers used the normal route of access. . . [they] did not violate the Fourth Amendment when they approached the trailer's back door with an intent to speak to its occupants regarding the reported

---

16 Clark argues that *Jardines* changed the law and left the cases cited by the City—many of which are also cited here—no longer good law. But the Court notes that *Shuck* was issued after *Jardines*, and even cites to it. *Shuck*, 713 F.3d at 567. Further, *Jardines* did not address the propriety of approaching a back door versus a front door. In *Jardines*, the problem was that officers came onto a front porch with a drug-sniffing dog. It was the presence of the dog that made the encounter problematic. *Jardines*, 569 U.S. at 9; *see also United States v. Carloss*, 818 F.3d 988, 993 (10th Cir. 2016) ("*Jardines* left our preexisting knock-and-talk precedent undisturbed.").

odor of marijuana." *Id.* at 568 (also noting in a footnote that this holding "is consistent with findings of other circuits"); *see also United States v. Thomas*, 430 F.3d 274, 276-80 (6th Cir. 2005) (rejecting argument that officers violated the Fourth Amendment when they knocked on the back door, "which served as the primary entrance to the home"); *United States v. Garcia*, 997 F.2d 1273, 1279-80 (9th Cir. 1993) ("If the front and back of a residence are readily accessible from a public place, like the driveway and parking area here, the Fourth Amendment is not implicated when officers go to the back door reasonably believing it is used as a principal entrance to the dwelling."); *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990) ("[A policeman] obviously can go up to the door . . . and, it seems to us, if that door is inaccessible there is nothing unlawful or unreasonable about going to the back of the house to look for another door, all as part of a legitimate attempt to interview a person.").

The facts in *Shuck* are similar to the facts in this case. Here, it is undisputed that there was no path to the front porch from the driveway, the steps were partially blocked with vegetation, and items on the porch at least partially blocked the front door. Clark admits that he had "trained" at least some of his visitors to come to the back entrance, and that he hoped the state of the front entrance would deter visitors. These undisputed facts, coupled with De La Torre hearing someone towards the back of the house, made his decision to walk that way in an attempt to contact Clark entirely reasonable; no reasonable jury could find otherwise. *See United States v. Raines*, 243 F.3d 419, 421 (8th Cir. 2001) (stating that "law enforcement officers must sometimes move away from the front door when attempting to contact the occupants of a residence"); *United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir. 1977) (finding that agents' actions in going toward the back of the house after getting no answer at the front to see if a person was in the back with a barking dog was not "incompatible with the scope of their original purpose . . ."); *United States v.*

*Diaz*, 2009 WL 3675006, at *2 (N.D. Fla. Oct. 30, 2009) ("If it appears that someone is in or around a house, officers may take reasonable steps to initiate contact by going to other areas of the property."). The fact that the front door was partially <u>visible</u>, as Clark contends, *see* Doc. 100 at 55, does not change the fact that De La Torre reasonably assumed that the front door was not the primary entrance.[17] The fact that De La Torre did not first knock on Clark's front door does not make his approach inappropriate. *See Alvarez v. Montgomery Cty.*, 147 F.3d 354, 358 (4th Cir. 1998) ("Other circuits likewise have found that the Fourth Amendment does not invariably forbid an officer's warrantless entry into the area surrounding a residential dwelling even when the officer has not first knocked at the front door."). Nor is the Court convinced that De La Torre exceeded the scope of the license. When Clark asked him to leave, he did so. It is undisputed that De La Torre was at the property no more than a few minutes and left within a minute of being asked to leave. Doc. 92 at 16-17; Doc. 100 at 19; *see Carloss*, 818 F.3d at 998 (finding license not exceeded when officers knocked for several minutes); *Ysasi v. Brown*, 3 F. Supp. 3d 1088, 1158 (D.N.M. 2014) ("[O]nce a person revokes the consent that permitted officers to enter the home or conduct a search, the officers should promptly leave, unless the officers have independent legal authority to remain.").

Accordingly, the Court does not need to determine whether De La Torre entered the curtilage of Clark's home, because even if he did, his actions in trying to find Clark on the property were taken in accordance with the implied license to approach the house. No reasonable jury could conclude there was a search of Clark's property under these facts. And if there was no search, there

---

[17] In his reply, Clark argues that police officers who came to his property in 2018 knocked on the front door, presumably in an attempt to show that the front door is the commonly used entrance for visitors. Doc. 100 at 56. But these unsupported factual allegations that occurred more than three years after the events of this case have no bearing on the issues currently before this Court and do no establish a factual dispute sufficient to defeat summary judgment. *See* Fed. R. Civ. P. 56.

was certainly no unconstitutional search. Given that, the Court does not need to reach the question of whether De La Torre's actions were attributable to the City's zoning regulations or the City's failure to train its code enforcement officers. Doc. 79 at 36-37; Doc. 92 at 48-50 This is because "[a] municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Hinton*, 997 F.2d at 782.

Accordingly, the City is entitled to summary judgment on Clark's Fourth Amendment claim.

### 2. Clark lacks standing to challenge other provisions regarding under the Fourth Amendment.

Clark's summary-judgment motion also argues that the City's zoning ordinance is void for vagueness because it unconstitutionally allows code enforcement officers to abate (or seize) non-conforming signs without a warrant. Doc. 79 at 40-43 (citing *Mathews v. Eldridge*, 425 U.S. 319 (1976)). The City does not directly address this claim but does seem to suggest that there is an extensive administrative process that must play out before any signs are ever seized. Doc. 92 at 46-48.

Neither party's argument on this point is exceedingly clear, but to the extent Clark is facially challenging the section of the zoning ordinance that permits code enforcement officers to enter property and seize non-conforming signs, the Court finds that he lacks standing. There are no factual allegations that any signs or any other items were ever seized from Clark's property, nor any facts that such a seizure was imminent. There was never even a search of or unlawful entry onto Clark's property.

As discussed above, standing requires that a plaintiff show an injury-in-fact. *Ward*, 321 F.3d at 1266. That injury must be concrete and particularized, as well as actual or imminent. *Initiative & Referendum Inst.*, 450 F.3d at 1087. Here, like with other provisions of the sign

ordinance he attempts to challenge, Clark was never subject to any search or seizure. No one entered his property unlawfully or seized any of his property. This distinguishes him from the defendant in *Camara v. Municipal Court of City and Cty. of San Francisco*, which Clark relies on. There, Camara was actually arrested and charged with refusing to allow a warrantless search of his home. *Camara v. Municipal Court of City and Cnty. of San Francisco*, 387 U.S. 523, 525-27 (1967). As the Court has already found, although the violation notice created a sufficient injury-in-fact to permit Clark to challenge Article 8, § 4.A.(6), it did not create an injury sufficient for Clark to challenge the other provisions of the City's zoning ordinance.

### C.    Clark's Inverse-Condemnation Claim (Count III)

Clark also asserts an inverse-condemnation claim under Kansas state law. This stems from the dispute between the parties about whether or to what extent there is an easement or City right-of-way on the portion of Clark's property that abuts the highway. Clark contends that the City, in sending the violation notice, effected a "regulatory taking" because the violation notice "substantially burdens Clark's First Amendment rights." Doc. 84 at 15; *see also* Doc. 79 at 29-30 (stating that violation notice restricted placement of signs in violation of his First Amendment right and "convert[ed] private property that is free and clear of burden to being property that is burdened by right-of-way restrictions (an effective easement).").

An inverse-condemnation claim is essentially the reverse of an eminent-domain claim. In an eminent-domain action, the governmental authority institutes the action to take property. *Estate of Kirkpatrick v. City of Olathe*, 215 P.3d 561, 565 (Kan. 2009).[18] By contrast, inverse-

---

[18] Although related, an inverse-condemnation claim is distinct from a "just compensation" or takings claim under the Fifth Amendment. The Fifth Amendment does not prohibit takings—only takings without just compensation. *Olson v. AT & T Corp.*, 431 F. App'x 689, 691-92 (10th Cir. 2011). A property owner cannot bring a Fifth Amendment claim until an inverse-condemnation claim has been adjudicated and just compensation denied. *Id.*; *see also Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194-97 (1985). Here, Clark's claim is for inverse condemnation under Kansas law, not under the Fifth Amendment. Doc. 55 at 14.

condemnation proceedings are bought by the party who owns property to allege that the property was taken for public use without the initiation of condemnation proceedings by the government. *Id.* "To succeed on a claim for inverse condemnation, a party must establish that he or she has an interest in real property affected by a public improvement project and that a taking has occurred. The question of whether there has been a compensable taking is one of law." *Id.*

The parties dedicate considerable portions of their briefs debating who owns the strip of land that is between 30-40 feet from the centerline of the highway that runs adjacent to Clark's property, as well as the nature of that ownership interest (an easement or fee simple). Doc. 79 at 15-29; Doc. 92 at 21-26. But the parties spend very little time on the more obvious question here, namely, whether any "taking" even occurred. That is essential to this claim.

Regulatory takings in Kansas can take three forms: physical, title, or economic. *Garrett v. City of Topeka*, 916 P.2d 21, 30-31 (Kan. 1996). A physical regulatory taking occurs when a regulation literally produces a physical intrusion, such as authorizing "low and frequent overflights for military airplanes." *Id.* A title regulatory taking occurs where a regulation "<u>significantly</u> interferes with the incidents of ownership." *Id.* (emphasis added). An economic regulatory taking "is a taking only if the economic impact on the landowner outweighs the public purpose of the regulation." *Id.*

The only taking Clark alleges is that the sign ordinance interferes with what he wants to do with his own property. But to the extent that is true, it is no more than can be said for every law or zoning ordinance, and it does not represent a significant interference with his ownership. Nor does the violation notice somehow create a cloud on Clark's title, as he suggests. Doc. 79 at 29-30. Under these facts, the Court finds that here has been no compensable taking as a matter of law.

*See Estate of Kirkpatrick*, 215 P.3d at 565 ("The question of whether there has been a compensable taking is one of law."). Accordingly, the City is entitled to summary judgment on this claim.

## IV.     CONCLUSION

THE COURT THEREFORE ORDERS that Plaintiff's Motion for Partial Summary Judgment (Doc. 78) is GRANTED IN PART AND DENIED IN PART.

THE COURT FURTHER ORDERS that Defendant's Motion for Summary Judgment (Doc. 91) is GRANTED IN PART AND DENIED IN PART.

THE COURT FURTHER ORDERS that Clark is granted summary judgment on his claim in Count I of his First Amended Complaint that Article 8, § 4.A.(6) is an unconstitutional content-based restriction under the First Amendment.

THE COURT FURTHER ORDERS that the City is granted summary judgment on Clark's Fourth Amendment claim (Count II) and Inverse Condemnation claim (Count III).

THE COURT FURTHER ORDERS that Clark's other challenges to the City's sign and zoning ordinances are dismissed without prejudice for lack of standing.

IT IS SO ORDERED.

DATED: <u>May 9, 2019</u>                    <u>*/s/ Holly L. Teeter*                </u>
                                                     HOLLY L. TEETER
                                                     UNITED STATES DISTRICT JUDGE